

# Exhibit E
04/11

KS187 - 23433
**Comfort Inn & Suites**

## CHOICE HOTELS INTERNATIONAL, INC.
## FRANCHISE AGREEMENT

**THIS AGREEMENT** ("Agreement") is made in Silver Spring, Maryland, effective as of the _30_ day of _June_, 2011, between **Choice Hotels International, Inc.**, a Delaware corporation ("we" or "us"), and **RAM INVESTMENT INC.**, a Kansas Corporation, **Nitin Bhakta**, Individually, jointly and severally ("you").

We and you agree:

**1. Definitions.** In addition to the terms that are defined in other parts of this Agreement, the following terms shall have the indicated meanings:

a. "Hotel" means the property located at **221 East Ash Street, Junction City, KS   66441** ("Location") and includes the building, land and all improvements, structures, fixtures, amenities, equipment, furniture and related rights, privileges and properties at such Location.

b. "Sleeping Rooms" means the number 72, which is and shall be the total number of rentable sleeping rooms in the Hotel, subject to change in accordance with Section 8, below.

c. "Meeting Rooms" means the total number of meeting, conference and/or banquet or similar rooms generally available for rent in the Hotel, subject to change in accordance with Section 8, below.

d. "Rentable Rooms" means the Sleeping Rooms and the Meeting Rooms, collectively.

e. "Designated Representative" means your representative for matters regarding this Agreement. Until you change the Designated Representative in accordance with Section 15 of this Agreement, your Designated Representative is **Mr. Nitin Bhakta** whose address is **1523 Mistletoe Circle, Junction City, KS 66441.**

f. "Opening Date" means the date that you begin to rent any portion of the Rentable Rooms under this Agreement.

g. "Gross Room Revenues" means revenues from the rental, sale, use or occupancy of any of the Rentable Rooms, for whatever purpose, including cash and credit transactions, whether or not collected by you, and any proceeds from business interruption insurance, as required by Section 12 of this Agreement. It does not include taxes required by law (including gross receipt taxes, property taxes, and hotel sales taxes), revenues from telephone calls, movie rentals, vending machines, room service or food and beverages sales.

h. "Hotel Supplies" means all furniture, fixtures, equipment (including, without limitation, computers, printers, telephones and facsimile machines), signs, amenities and other supplies used in the construction, renovation, maintenance and operation of the Hotel.

i. "Brand Mark" means the trademark and trade name **Comfort Inn & Suites®** and the logo designated by us for use in association with the Hotel (including designs, stylized letters, colors and other elements that we permit you to use at the Hotel and in advertising for the Hotel) and/or any other trademark, whether registered or not, or any domain name, as we may require from time to time be used in connection with the Hotel.

j. "Choice Marks" means collectively all of our trademarks or trade names, including the Brand Mark, the trademarks and trade names ASCEND COLLECTION®, CAMBRIA SUITES®, COMFORT

1

INN®, COMFORT SUITES®, CLARION®, QUALITY®, SLEEP INN®, MAINSTAY SUITES®, SUBURBAN EXTENDED STAY HOTEL®, ECONO LODGE®, RODEWAY INN®, and the names of our Property Management System and Reservation System, together with all related logos, trade dress, and any other additional or substituted trademarks, trade names, service marks or logos (whether registered or not) currently owned, licensed or used by us or that we later adopt, purchase or develop.

     k.   "Rules and Regulations" means our then-current published rules and regulations, as updated and/or modified by us in our discretion, from time to time (and any supplements) and brand guidelines (including any manuals or policies that we may publish) containing, among other things, our standards and requirements for constructing, equipping, furnishing, supplying, operating, maintaining and marketing the Hotel.

     l.   "System" means our then-current concept and method for providing hotel accommodations with a high standard of service, courtesy and cleanliness using the Brand Mark and any trade secrets and includes our Property Management System and Reservation System, our business referral, gift card and credit card agreements, this Agreement, the Rules and Regulations, and those identifying brand characteristics as we may from time to time reasonably designate.

     m.   "Other Choice Brand Hotels" means hotels that are authorized by us to use the Choice Marks (other than the Brand Mark), our system for such Choice Mark and our Intellectual Property.

     n.   "Property Management System" means the then-current version of the automated system that we will license to you on a non-exclusive basis to assist you to operate and manage the Hotel and to capture all data and record all transactions entered into by you and the Hotel in connection with the operation of the Hotel, including all transactions relating to the Rentable Rooms.

     o.   "Reservation System" means the then-current methods and automated systems that we use (including our call centers and any and all related telecommunications systems, e-commerce tools and techniques, websites or mobile applications, call-forwarding or call-transfer programs and techniques or similar tools or methods used by us as modified from time to time) to take, hold, honor, and report advance reservations that are made in connection with the use of the Rentable Rooms at the Hotel and at the Other Choice Brand Hotels.

    **2.**  **Grant of License.** Subject to your compliance with all of your obligations under this Agreement, we grant to you a non-exclusive, limited, revocable license to use (without the right to sublicense) our System and the Brand Mark to operate the Hotel during the Term. This license is non-exclusive, except to the extent stated in this Agreement or in our then-current incremental impact policy ("Impact Policy") and our then current version of the fair franchising policy ("Fair Franchising Policy"). You do not have the right to use any of the Choice Marks other than the Brand Mark in connection with the operation of the Hotel.

    **3.**  **Term.** The term of this Agreement ("Term") begins on the date both you and we sign this Agreement and ends on the date that is 10 years after the Opening Date. However, if the Hotel is not a hotel that is to be Newly Constructed, then both you and we have the right to terminate this Agreement, with or without cause, and as a matter of right, on the 5th anniversary of the Opening Date, by giving prior written notice to the other, provided, that you may not exercise your right to terminate this Agreement unless you have paid all fees and charges due under this Agreement (and all related agreements, including any promissory notes or other incentive agreements, and any agreements relating to the use of our System) before the time of the proposed termination. The written notice required by this Section 3 shall be given at least 12 months prior to the date of the proposed termination (if given by us) and at least 6 months before the date of the proposed termination (if given by you). If you elect to terminate this Agreement on the 5th Anniversary of the Opening Date by giving us 6 months prior written notice as outlined in this Section 3, you must continue to remain current on all fees and charges under this Agreement through the date of such termination in order for your termination to be effective. For the avoidance of doubt, a hotel that is to be "Newly Constructed" will mean a hotel that is not comprised of any existing structure and for which new footings are required to be poured to initiate the hotel's construction.

KS187

4. **Fees and Reports**.

a.  <u>Affiliation Fee</u>.  When you sign this Agreement, you will pay us an affiliation fee of **$20,000.00** ("<u>Affiliation Fee</u>").  The Affiliation Fee is fully earned and non-refundable when both you and we sign this Agreement whether or not you open the Hotel.  Any monies that you have paid to us as an application fee will be credited toward the Affiliation Fee.

b.  <u>Monthly Fees</u>.  Beginning on the Opening Date, you will pay us for each month during the Term each of the following monthly fees (collectively, "<u>Monthly Fees</u>") in consideration for the license granted to you in <u>Section 2</u>:

1.  <u>Royalty Fee</u>.  A royalty fee of 5.65% of the preceding month's Gross Room Revenues ("<u>Royalty Fee</u>").

2.  <u>System Fee</u>.  A system fee of 3.85% of the preceding month's Gross Room Revenues for the ongoing development, maintenance and upgrading of the Property Management System and Reservation System, and for advertising, publicity, public relations, marketing, reservations and other similar services that we will provide to you under this Agreement and for our System (collectively, the "System Fee").  You acknowledge and agree that we may increase the System Fee for increases attributable to inflation, costs of advertising, publicity, public relations or marketing, or for increases in our cost of providing the Property Management or Reservation Systems or any of the other aspects of our System, so long as the increases apply to all or most of the U.S. hotels that are authorized to use our System, unless we get your approval to a greater amount.

c.  <u>Payments and Reports</u>.  Beginning on the Opening Date, within 5 days after the end of each calendar month during the Term, you will send us a statement on a form to be determined by us showing the Gross Room Revenues, occupancy and other related information that we request for the immediately preceding month or, in the alternative, at our election, we will gather the Gross Room Revenues, occupancy and other related information through any automated information reporting systems we establish. In the event we elect to have you send us a statement of the Gross Room Revenues, you will certify that your reports are true and accurate. If we elect to have you send us a statement of the Gross Room Revenues, and you do not send us the required reports on time, we will estimate your Gross Room Revenues for interim billing purposes, and you must pay us a late charge of 1.5% of your previous month's Monthly Fees.  If we elect to gather the Gross Room Revenues through our automated reporting systems, and we are unable for whatever reason to obtain an accurate report of the Gross Room Revenues, we will estimate your Gross Room Revenues for interim billing purposes. Interim bills will be considered accurate until we receive any late monthly reports or acquire accurate information through our automated reporting systems, as appropriate.  We will bill you for the Monthly Fees (and interest or other penalty, if any) due under this Agreement each month, and you will pay us those amounts by the 25th day of the same month.  You agree that timely payment of the Monthly Fees and any other amounts and fees due to us is of the essence for the purposes of this Agreement.  You also agree that we may apply payments that you make in any order we determine regardless of any contrary language you may indicate. You agree that you will participate in computerized or automated information reporting programs and electronic fund transfer programs that we adopt for use by hotels that are authorized to use our System.  If we adopt electronic fund transfer programs, you agree to make the necessary arrangements with your bank to participate in such programs and you agree to purchase computer hardware, computer software and related telephone or other network services reasonably required in order to properly participate in these programs.

d.  <u>Hotel Data</u>.  You will, in a manner and form satisfactory to us and utilizing accounting and reporting standards as reasonably required by us, prepare on a current basis (and preserve for no less than 7 years), complete and accurate records concerning Gross Room Revenues and all financial, operating, marketing and other aspects of the Hotel specified by us from time to time ("<u>Hotel Data</u>") and maintain an accounting system which fully and accurately reflects all financial aspects of the Hotel and its business.  The Hotel Data includes all bank statements, federal tax returns, state tax returns, local

3

KS187

occupancy tax returns, daily revenue reports, monthly and annual revenue summary reports, maid logs, guest registration folios and complete annual financial statements (profit and loss statements, balance sheets and cash flow statements). The Hotel Data will be maintained at the Hotel, or, if you notify us in writing, at an alternate location suitable for inspection by us. Nothing in the foregoing shall limit us from reviewing Hotel Data that is older than 7 years or from recovering amounts owed to us from any period of time during the Term.

e.  Financial Statements and Audit. If we request in writing, you will send us copies of the Hotel Data and certified financial statements (including a profit and loss statement, balance sheet, cash flow statement, or such other financial data or reports as we may request, in a form satisfactory to us) for the Hotel for the prior fiscal year, and you will have the Gross Room Revenues or other monies due hereunder computed and certified as accurate by a certified public accountant. During the Term and for 7 years afterward, we and our authorized representatives will have the right to verify information required under this Agreement by requesting, receiving, inspecting, copying and auditing the Hotel Data and any and all records or documents related to the Hotel Data wherever they may be located. If any inspection or audit discloses a deficiency in any payments due hereunder, you must pay us all deficiencies plus interest at the rate indicated in Section 4(f), below. If the deficiency in any payment is willful or exceeds 5% of the correct amount, you will also immediately pay to us the entire cost of the inspection and audit, including travel, lodging, meals, salaries, professional fees and other expenses of the inspecting or auditing personnel.

f.  Interest. You will pay us interest on all charges, costs fees and amounts due under this Agreement but not paid on time at the rate of 1.5% per month or portion of a month, but not more than the maximum interest rate permitted by applicable laws.

5.  **Our Duties**. We will during the Term:

a.  Rules and Regulations. Make available to you a copy of the Rules and Regulations;

b.  Quality Assurance. Administer a quality assurance program that may include periodic visits to the Hotel (by us or our authorized representatives) and guest satisfaction surveys to evaluate your compliance with this Agreement and the Rules and Regulations and advise you on changes that you must make to the Hotel or its operations to comply with this Agreement or the Rules and Regulations;

c.  System Services. (i) Allow you to use the Property Management System and the Reservation System, (ii) provide marketing services, including national, international and regional advertising, promotion, publicity, marketing research, programs and other related marketing activities, that we reasonably determine are appropriate for the promotion of the Hotel, our System and the Other Choice Brand Hotels; and (iii) periodically make available to the traveling public a directory of all hotels which are in good standing and that are authorized to use our System. You acknowledge and agree that we may combine the services that we will provide to you in clauses (i), (ii) and (iii), above, with other hotels that are authorized to use the Brand Mark and/or our System, or other hotels that we or our affiliates operate in our sole, but reasonable, discretion. You also acknowledge and agree that we will not be obligated to make reservations for the Hotel for any dates following the scheduled date of expiration or termination of this Agreement, or during any period in which your rights are suspended under Section 10(c) of this Agreement;

d.  Consultation. Make available to you, at our discretion, additional consultation and services to assist you to construct, renovate, maintain, operate, and/or market the Hotel on the same basis as provided to other hotels that are authorized to use our System in exchange for reasonable fees that we may establish in advance or on a project-by-project basis for this consultation and service; and

e.  Confidentiality. Except as otherwise permitted or as required by law or as reasonably required by us to promote and administer our System, maintain in confidence all information that you provide us about the Hotel's operations and profitability, including your Hotel Data.

6. **Your Duties.** You will during the Term:

a. <u>Compliance with Rules and Regulations</u>.  Comply with the requirements of this Agreement and the Rules and Regulations, which you acknowledge we may modify and/or update in our sole discretion from time to time, and not disclose this Agreement or the Rules and Regulations (including any copies of the Rules and Regulations that are no longer the then-current version) to anyone except your authorized employees (or the employees of your management company, if authorized by us);

b. <u>Good Repair</u>.  Construct, renovate, operate, furnish, maintain and advertise the Hotel according to this Agreement and the Rules and Regulations; undertake all repairs, cleaning, redecoration, repainting, and replacement of obsolete or outdated Hotel Supplies; and take such other corrective action as is necessary to maintain the Hotel interior and exterior, including any parking areas and food and beverage facilities, in a clean, sound, and attractive condition and good repair at all times;

c. <u>Ethical Standards; Performance</u>.  Establish and maintain a high ethical and moral standard in connection with your operation of the Hotel and not allow or sponsor any activity at the Hotel that could reasonably be determined to negatively impact the Brand Mark, the Choice Marks, our System, the Other Choice Brand Hotels or our business reputation; operate the Hotel in a professional manner that meets or exceeds the generally accepted standards of performance of leading hotel operators in the industry;

d. <u>Compliance with Law; Limited Use</u>.  Comply with all local, state, and federal laws, rules, regulations or agency orders applicable to you and the construction, renovation, operation, maintenance and promotion of the Hotel and not permit the Hotel to be used for any purpose or activity that is unlawful or that is not contemplated by this Agreement or the Rules and Regulations, without our prior written consent;

e. <u>Training</u>.  Comply with our training requirements by ensuring that you and the Hotel's general manager(s) attend (at the times required by us) our then-current training programs ("Training Programs") and pay the cost of tuition, living expenses, and travel expenses associated with attendance at the Training Programs by you and the Hotel's general manager(s).  If "you" is a legal entity such as a corporation, partnership or limited liability company or if "you" consists of multiple individuals, only one of the principals will be required to attend the Training Programs;

f. <u>Signage</u>.  Obtain and display prominently at the Hotel our approved interior and exterior signage in the manner described in the Rules and Regulations and maintain the signage in a clean and attractive condition, and in good working order at all times;

g. <u>Property Management and Reservation Systems</u>.  Use the Property Management System (and the equipment, networks, software and procedures (including hardware and software refresh requirements) that are described in the Rules and Regulations) to operate and manage the Hotel and in connection with all guest transactions (including all transactions relating to the Rentable Rooms), and use our Reservation System to accept, hold, honor and track all reservations for the Rentable Rooms.  You understand and agree that your use of the Property Management System and the Reservation System is governed by a separate agreement, as modified and/or updated from time to time ("Online Terms of Use") and you agree that you will abide by such Online Terms of Use.  You also acknowledge and agree that each of we and you have ownership rights in data used or generated by the Property Management System or the Reservation System;

h. <u>Evaluation</u>.  Allow us (or our authorized representatives) to enter the Hotel at any reasonable time to evaluate your compliance with this Agreement and the Rules and Regulations.  During such visit, you will assist us (or our authorized representatives) in such manner as is required for us (or our authorized representatives) to conduct our evaluation and, subject to availability, provide us (or our authorized representatives) with one free Sleeping Room for one night.  In addition, you agree to take all steps necessary to correct any deficiencies identified in our evaluation within the time periods that we specify;

i.   Rate Information.  When we request, send us a written description of your Hotel and its then-current rates so that we may include this information in directories that we periodically make available.  If you do not send us changes to the information that you provide to us by the deadlines that we indicate, you will honor the rates and descriptive information on record at the time of the deadlines;

j.   Promotional Programs.  Participate in and honor the terms of any discount or promotional program (including any room discounts, rewards programs, frequent traveler programs, photographic or virtual tour programs or gift card programs that are applicable to the Hotel or other hotels that are authorized to use the Brand Mark and/or some or all of the Other Choice Brand Hotels) that we offer to the public on your behalf and any room rate quoted to any guest at the time the guest makes an advance reservation. You agree that you will take all action necessary (including the supply to us of all information and the purchase of any supplies, equipment or services) to participate in any discount or promotional programs, and that you will grant us all necessary rights in and to any photographs, video and/or other marketing materials that we may require in order to reasonably undertake such promotional programs on behalf of the Hotel, other hotels that are authorized to use the Brand Mark and/or some or all of the Other Choice Brand Hotels;

k.   Travel Agent Commissions.   Promptly pay all travel agent commissions and global distribution system charges due from you in connection with the Hotel whether payable by you directly or collected by us on behalf of others, and abide by the Rules and Regulations related to travel agent and global distribution system procedures;

l.   System Referrals.  Use your best efforts to maximize and increase the business of the Hotel, and if you are unable to accommodate a potential guest, refer the guest to other hotels that are authorized to use the Choice Marks and are near to the Hotel, if any;

m.  ADA Certification.  Ensure that the Hotel complies with the requirements of the Americans with Disabilities Act ("ADA"). Prior to the Opening Date, you will provide to us, a certification from your architect, your general contractor, a consulting architect or you, on a form satisfactory to us, certifying that the Hotel is in compliance with the ADA.  The Hotel may not open, use the Brand Mark or our System until this certification is properly completed and delivered to us;

n.   Franchise Association. Join and maintain membership in the franchise association for hotels that are authorized by us to use the Brand Mark ("Franchise Association");

o.   Renovations.  Undertake, at our written request, remodeling, renovations, and modifications to existing improvements, necessary to modernize and conform the Hotel to the Rules and Regulations or other requirements of our System ("Renovations") and sign any writing that we prepare to document your obligation to complete such Renovations.  Within 90 days after receipt of our written request that your Hotel undergo Renovations, you will submit to us for our review and approval, complete and professional drawings and plans for such Renovations before beginning any work to complete the Renovations.  You will complete the required Renovations within the time reasonably specified by us in our written request. You acknowledge and agree that the obligations described in this Section 6(o) are in addition to your ongoing obligations to comply with Section 6(b);

p.   Identifying Information.  Send us, before the Opening Date (and any time there is a change in any of the information), the following, as appropriate:

1.   the legal name and business type (corporation, limited liability company, limited partnership, etc.) of the Hotel's operating entity;
2.   its federal TIN (taxpayer identifying number);
3.   its state income tax account number(s);
4.   its state payroll tax (withholding and unemployment tax) account number(s);
5.   its state sales tax and occupancy tax account number(s); and
6.   its local (county and city) occupancy tax account number(s).

6

KS187

q. <u>Guest Complaints</u>. Participate in, and pay all charges in connection with all required guest complaint resolution programs, including acceptance and payment of charge-backs to the Hotel for guest refunds or credits; and

r. <u>Construction and Complete Renovation Related Duties</u>. In addition to the other provisions of this Agreement, if the Hotel has yet to be constructed or if the Hotel is to be renovated you agree that you will:

1. <u>Plans</u>. Ensure that your preliminary drawings and designs for the Hotel satisfy the Rules and Regulations and the then-current prototype design specifications for hotels that are authorized to use the Brand Mark and provide a copy of your preliminary drawings and designs to us for our review and approval at least 3 months before Construction Start, and final working drawings and final architectural designs for the Hotel ("<u>Plans</u>") to us for our review at least 30 days before Construction Start. "<u>Construction Start</u>" means the date that bona fide pouring of footings for the Hotel begins at the Location in the case of a hotel to be constructed or the date that Renovations begin in the case of an existing hotel that is to be renovated. We agree to provide you with written notice of our review and determination of the Plans within fifteen business days after the date we have received the Plans and agree that if we fail to provide you notice in accordance with this <u>Section 6(r)(1)</u>, the Plans are deemed to be approved by us. If Construction Start does not commence within 6 months of our written approval of your final architectural designs for the hotel (or within 6 months of automatic approval if we fail to provide you notice within fifteen business days in accordance with this <u>Section 6(r)(1)</u>), then you must resubmit final architectural designs for approval at least 30 days prior to Construction Start;

2. <u>Timing and Extensions</u>. Cause Construction Start to occur within 12 months of the effective date of this Agreement, and within 5 days after Construction Start, inform us in writing that Construction Start has occurred. If you do not cause Construction Start to occur within 12 months of the effective date of this Agreement, you may request, before the end of the 12 months, an additional 3 months for Construction Start. We are not obligated to extend the time for Construction Start. If we agree to extend the time for Construction Start beyond the original 12 month requirement, you will pay us an extension fee of $5,000 for each 3-month extension that we grant to you;

3. <u>Completion</u>. Continue Hotel construction (or renovation) in accordance with the Plans, after Construction Start, without unreasonable interruption, until the Hotel is ready for our inspection. You must complete Hotel construction (or renovation), including furnishing, equipping, and preparing for opening, within 12 months after Construction Start;

4. <u>Progress Reports</u>. Send us, when we request during construction (or renovation), reports showing the progress made toward completing Hotel construction (or renovation);

5. <u>Use of Brand Mark</u>. Use the Brand Mark before the Opening Date only as allowed in Section 7(c) of this Agreement;

6. <u>Cooperation/Inspection</u>. Cooperate with us, and require your architect, engineer, contractors and subcontractors to cooperate with us, and allow us to inspect the Location and the Hotel construction (or renovation) to determine whether construction (or renovation) satisfies the Rules and Regulations, the then-current prototype design specifications for hotels that are authorized to use the Brand Mark, and the Plans;

7. <u>Hotel Supplies</u>. Order, purchase and/or lease and install all Hotel Supplies, related equipment, supplies and other required items before the Opening Date;

8. <u>Advertising</u>. Advertise the Hotel locally, at your expense and in a manner meeting our specifications; and

9. <u>Opening Authorization</u>. Notify us in writing at least one month before the Opening Date. We will inspect, and if we reasonably determine it to be appropriate, authorize you to begin

operating the Hotel under the Brand Mark and this Agreement.  You will not begin operation of the Hotel using the Brand Mark or our System until you have received our specific written authorization to do so.

7.  **Intellectual Property.**

a.  <u>No Ownership Rights</u>.  You acknowledge and agree that except as permitted by this Agreement or any Online Terms of Use, you do not have any right, title or interest in and to the Brand Mark or the Choice Marks, Rules and Regulations, System, our then current concept and method for providing hotel accommodations using any of the Choice Marks, Property Management System, or Reservation System ("<u>Intellectual Property</u>") and you will not contest our rights in and to such Intellectual Property or to current or future derivations of or improvements made to the Intellectual Property, nor our right to register our rights in the Intellectual Property or to grant to others the right to use the Intellectual Property or any other intellectual property that we own.  You understand that the Intellectual Property will remain our property, and that your use of any portion of the Intellectual Property inures to our benefit.  You also agree that you will not sub-license the Intellectual Property rights we have granted to you under this Agreement or the Online Terms of Use, to any other person or entity and you will not use such Intellectual Property for any purpose other than in connection with the Hotel.  You agree to assign and you do assign any and all rights you or any other party working on your behalf may have or develop in the Intellectual Property at no cost to us.  You acknowledge and agree that all rights to our Intellectual Property that have not been granted to you in this Agreement or the Online Terms of Use will remain ours.

b.  <u>Limited Use; Web Sites</u>.  You acknowledge and agree that you will not include the Brand Mark (or any other Choice Marks), any words that constitute a portion of the Brand Mark (or any other Choice Marks), words that describe the Brand Mark (or any other Choice Marks), any portion of the names of our Property Management System or Reservation System, or anything confusingly similar to these marks or words ("<u>Choice-Related Words</u>") in your name or the name of any of your affiliates, whether a partnership, corporation, limited liability company, joint venture or any other type of business organization.  You will not establish, or operate a previously established web site on the internet (or on any other network, wireless or otherwise) using any domain name (or other identifying characteristics) that contains any of the Choice-Related Words, or any other portion of our Intellectual Property or anything similar to our Intellectual Property or which does not comply with our then-current domain name policy or our property website guidelines, internet distribution policy, or such similar policies or regulations adopted by us from time to time and made available to you.  You acknowledge and agree that the restrictions on your use of the Choice-Related Words will survive the expiration or earlier termination of this Agreement and that we retain the right to pre-approve your use of linking and framing between your internet (or other network) web pages and all other web sites.  We have the right to determine the content and use of online or electronic media associated with any of the Choice Marks.  You may not participate in any website or other electronic media (including social media) that markets goods and services under the Choice Marks unless it is first approved in writing by us.

c.  <u>Limited Use of Brand Mark</u>.  Before the Opening Date, you may make the following limited use of the Brand Mark:

1.  <u>Temporary Signs</u>.  No earlier than 90 days prior to the Opening Date, use the Brand Mark on a temporary sign, meeting our standards, at the Location advising the general public that a hotel authorized to use the Brand Mark is under construction;

2.  <u>Local Media</u>.  No earlier than 90 days prior to the Opening Date, use the Brand Mark to promote the Hotel construction and opening in the local media;

3.  <u>Supplies</u>.  No earlier than 90 days prior to the Opening Date, purchase operating supplies and equipment bearing the Brand Mark required for Hotel operation; and

4.  <u>Permanent Signs</u>.  No earlier than 30 days before the Opening Date and only with our written consent, install permanent Hotel signs meeting our standards bearing the Brand Mark and the

8

designated logo.

d.   Permitted Registration.  If you are required by law to register any of our Intellectual Property, your registration application must specify that you will use our Intellectual Property:  (i) only at the Hotel and in advertising for the Hotel; (ii) only during the Term; and (iii) without claiming any rights in and to the Intellectual Property during or after the Term.

e.   Notice of Suit; Injunctive Relief; Survival.   You will promptly notify us of any suit filed or demand made against you challenging the validity of our Intellectual Property ("IP Claim").  Following the receipt of such notice from you and using our attorneys, we agree to defend you against any IP Claim, and to defend and indemnify you against your loss, cost or expense related to such IP Claim, except where such IP Claim arose because you used our Intellectual Property in violation of our domain name policy, property website guidelines, internet distribution policy, this Agreement, the Online Terms of Use, or the Rules and Regulations. You will not settle or compromise any IP Claim without our prior written consent, and you agree to cooperate with us in defending against any such IP Claim.  In connection with such IP Claim, you acknowledge and agree that if at any time during the Term you do not immediately discontinue the use of our Intellectual Property (including the Brand Mark) or the Choice-Related Words following our notice to you to discontinue such use, we will seek injunctive and equitable relief for your infringement (or use of the Choice-Related Words) and, in that event, you waive, to the maximum extent permitted by law, any requirement for any bond for the issuance of any injunction, and if a bond is required, you agree that it will not exceed $1,000.  The provisions of this Section 7 will survive the expiration or earlier termination of this Agreement.

**8.   Change in Sleeping Room Count**.  You may change the Sleeping Rooms by 5% or less by constructing additional (or removing) Sleeping Rooms, but only after providing prior written notice to us.  If you wish to change the Sleeping Rooms by more than 5% by constructing additional (or removing) Sleeping Rooms or if you wish to make substantial alterations to the Hotel, you may not do so without our prior written consent, which will not be unreasonably withheld.  If we consent to your expansion of the Hotel or to substantial alterations to the Hotel, you must send us your construction plans and pay us an expansion fee for each addition to the number of Sleeping Rooms equal to the then-current per-room charge for hotels that are permitted to use the Brand Mark, but the expansion fee will be not less than $1,000.  We will add any additional Sleeping Rooms or Meeting Rooms that you construct to the Rentable Rooms (or delete any Sleeping Rooms or Meeting Rooms that you remove from the Rentable Rooms), and you will include revenues from the additional Sleeping Rooms and any additional Meeting Rooms to calculate the Gross Room Revenues for determining the Monthly Fees due under this Agreement.

**9.   Assignment.**

a.   Our Assignment.  We may sell or assign all or part of our rights or obligations under this Agreement to any person or legal entity.  Any such sale or assignment will inure to the benefit of any assignee or other successor.

b.   Your Assignment.  Your rights and duties under this Agreement are personal to you.  We entered into this Agreement and granted the rights outlined in this Agreement to you in reliance on the business skill, financial capacity and personal character of you and your principal owners.  You may not sell, assign, transfer, lease, or otherwise encumber any direct or indirect interest that you have in the Hotel, in you, or in any rights or obligations under this Agreement without giving us at least 15 days prior written notice and obtaining our prior written consent, which will not be unreasonably withheld. Furthermore, if a Controlling Interest (as defined in Section 9(d)) of the originally approved ownership of the Hotel is being transferred or if you are conveying the Hotel or more than a 50% undivided interest in the Hotel, you must also comply with all reasonable conditions we require (including the signing of the then-current form of the franchise agreement for hotels that are authorized to use the Brand Mark by the transferee and payment of a re-licensing fee equal to the then-current affiliation fee we charge) for hotels that are authorized to use the Brand Mark before we will approve of such transfer.  Our consent is not required for a mortgage, for a collateral assignment of this Agreement as collateral for a mortgage, or for the sale or transfer by you of securities in a publicly-traded corporation or entity that individually, or in the

KS187

aggregate with other sales or transfers by you, constitute the sale or transfer of less than 5% of the outstanding capital stock or other equity interests in you or the Hotel. In order to ensure compliance with this Section 9(b), you permit us to file a notice on the title to your hotel indicating our interest under this Agreement. We agree to remove our registration once you have complied with the terms and conditions of this Section 9 (b) and we agree to bear the cost of any such registrations. If you assign or transfer the Hotel or any rights granted to you or your obligations under this Agreement without our written consent, you breach this Agreement and we may terminate this Agreement.

c.   Transfer on Death, Mental Incompetence or to Close Family Member. If you, or if "you" are an entity, any natural person in you dies or becomes mentally incompetent, the executor, administrator, or personal representative of that person must transfer that person's ownership interest in you or the Hotel (within 12 months after death or determination of mental incompetence) to one or more of the remaining persons in your entity (if applicable) or to heirs of the deceased person that we approve. If you wish to transfer your ownership interest in the Hotel to a close adult family member (e. g., current spouse, parent, child, sibling, or grandparent) ("Close Family Member"), that Close Family Member must demonstrate to us that he or she has both the financial ability and experience necessary to operate the Hotel as required by Section 6(c) before we will approve a transfer. No additional fees will be payable for any transfers of an ownership interest in the Hotel due to death or determination of mental incompetence. However, if you wish to transfer your ownership interest in the Hotel to a Close Family Member, a nominal application fee (not to exceed $1,000) will be due to us, which will be fully refundable if we do not approve the transfer. Our approvals under this Section 9(c) will not be unreasonably withheld.

d.   Controlling Interest. For purposes of this Agreement, "Controlling Interest" includes your interest if you are an individual and you own more than a 50% ownership interest in the Hotel, any general partner's interest in a partnership entity, 50% or more of the voting stock of a corporate entity, 50% or more of the ownership interests in a limited liability company and a 50% or more undivided interest in the Hotel.

## 10. Default and Termination.

a.   Termination By You. If we default in our material obligations under this Agreement, you may terminate this Agreement only if you first give us written notice of the defaults and of your intention to terminate this Agreement and we have not cured those defaults within 30 days after receiving your written notice, or within 12 months if our default relates to the listing of your Hotel in directories that we make available.

b.   Termination By Us.

1.   Termination with Notice. If you default in your material obligations under this Agreement, we may terminate this Agreement, effective on the date stated in our notice (or the earliest date permitted by applicable law) as follows:

(a)   Non-Payment of Fees. If you do not pay us the Monthly Fees or any other fees, charges and amounts due under this Agreement (including travel agent commissions and global distribution system fees) or file required monthly reports of Gross Room Revenues, within 10 days of our written notice of default to you;

(b)   Breach. If you do not cure fully any other breach of your obligations or warranties under this Agreement, within 30 days of our written notice of default to you; or

(c)   Other Agreements. If you or an affiliate of you materially breaches any other instrument or agreement with us or our affiliates, or any mortgage, deed of trust or lease covering the Hotel, unless cured within any applicable notice or grace periods contained in those documents.

2.   Immediate Termination Effective on Notice. Upon written notice to you, we may terminate this Agreement immediately, without giving you an opportunity to cure the default, if:

10

(a) <u>Imminent Threat</u>.  There is an imminent threat or danger to public health or the safety of persons or property resulting from the construction, renovation, maintenance, or operation of your Hotel;

(b) <u>Abandonment; Loss of Possession; Failure to Open</u>.  Subject to <u>Section 14</u> of this Agreement, you stop operating the Hotel using the Brand Mark or according to the requirements of our System or this Agreement for any period of time, you abandon the Hotel, you lose the right to possess the Hotel, you fail to open the Hotel using the Brand Mark or in accordance with this Agreement, or you lose the right to transact business in the jurisdiction in which the Hotel is located;

(c) <u>Criminal Behavior</u>.  You (or a beneficial owner of you) are convicted of a felony, a fraud, a crime involving moral turpitude or any other crime or offense that we reasonably believe is likely to have an adverse effect on the Brand Mark, the Choice Marks, our System, the Other Choice Brand Hotels, our business, our goodwill, our Intellectual Property, or our interest in this Agreement or any other instrument or agreement that we may have entered with you;

(d) <u>Transfer</u>.  You (or a beneficial owner of you) transfer or purport to transfer any rights or obligations under this Agreement, any Controlling Interest in you, your interest in the Hotel, or a Controlling Interest in the Hotel without our prior written consent, except as otherwise permitted under <u>Section 9(b) or 9(c)</u> hereof;

(e) <u>False Records</u>.  You maintain false books or records, send us false reports, or make any materially false statement in your franchise application or any other document you are required to submit to us;

(f) <u>Bankruptcy</u>.  You become insolvent or make a general assignment for the benefit of creditors or are unable to pay your debts to creditors on a timely basis;

(g) <u>Insurance</u>.  You do not buy, maintain or send us evidence of insurance as required by this Agreement, or if we opt to procure, on your behalf, insurance required by this Agreement and you fail to reimburse us as we require under <u>Section 12(f)</u>;

(h) <u>Multiple Defaults</u>.  We send you 2 or more written notices of default under this Agreement for the same or a similar cause or reason in any consecutive 12 month period during the Term, whether or not cured; or

(i) <u>Construction Start Date</u>.  You do not (i) begin construction or renovation of the Hotel on or before the date required by <u>Section 6(r)(2)</u> of this Agreement, (ii) submit Plans to us for our approval prior to Construction Start, and in accordance with <u>Section 6(r)(1)</u>, or (iii) once begun, do not continue, without unreasonable interruptions, the construction or renovation of the Hotel.

c.  <u>Suspension of Franchise Rights</u>.  If you breach any material obligation required by this Agreement or are in default hereunder, we may, after 10 days from our written notice of default (or longer time required by law) for financial defaults, or after 30 days from our written notice of default (or longer time required by law) for non-financial defaults, or immediately in the case of a breach under <u>Section 10(b)(2)</u>, above:  (i) suspend any or all services that we (or our authorized representative) provide to you in connection with our System, or (ii) suspend your right to use our Intellectual Property.  In addition, while the default remains uncured, you will have no rights under the Impact Policy or the Fair Franchising Policy.  We will reinstate the suspended System services or the right to use our Intellectual Property if you cure your default before this Agreement terminates and pay us a fee for processing the suspension and reinstatement in the amount of $5,000 (or as otherwise established in the Rules and Regulations).  If we suspend System services or your right to use our Intellectual Property, we may use other remedies, including termination of this Agreement, after the appropriate time to cure, if any, has lapsed.

d.  <u>Our Remedies</u>.

11

1.   <u>No System Services</u>.  If this Agreement expires or is terminated, we will cease to provide you with any services in connection with our System, which will include removal of the Hotel from any directories, cessation of promotion programs and advertising, and cessation of your use of our Intellectual Property.  In addition, we may notify guests holding reservations we made for you that the Hotel is no longer authorized to use the Brand Mark, our Intellectual Property or receive services in connection with our System.

2.   <u>Liquidated Damages -- Post-Opening Termination</u>.  If we terminate this Agreement due to your default after the Opening Date, you will pay us, within 30 days after termination, as liquidated damages and not as a penalty for the premature termination of this Agreement, an amount equal to the product of (i) the average monthly Gross Room Revenues during the prior 12 full calendar months (or the shorter time that the Hotel has been open), multiplied by (ii) the Royalty Fee payable in the Remaining Months (as defined below), multiplied by (iii)  the number of months until the next date that you could have terminated this Agreement without a penalty ("<u>Remaining Months</u>"), not to exceed 36 months.  However, the product of (i) multiplied by (ii) will not be less than the product of $45.00 multiplied by the greater of the currently existing or originally approved Sleeping Rooms.

3.   <u>Liquidated Damages – Pre-Opening Termination</u>.  If we terminate this Agreement due to your default prior to the Opening Date, you will pay us, within 30 days after the termination, as liquidated damages and not as a penalty for the premature termination of this Agreement, an amount equal to the product of (i) the greater of the currently existing or originally approved Sleeping Rooms, multiplied by (ii) $45.00, multiplied by (iii) the Remaining Months (but not to exceed 36 months).

4.   <u>Acknowledgement</u>.  You acknowledge and agree that the injury to us caused by your breach of this Agreement and its termination is difficult or impossible to accurately estimate, and that the methods of calculating liquidated damages in Sections 10(d)(2), 10(d)(3), and 11(a)  are reasonable estimates of our probable loss resulting from your breach of this Agreement and its termination. Payment of liquidated damages by you does not affect your obligation to pay us all Monthly Fees and other fees and amounts due to us that accrued before the termination of this Agreement nor does it affect your continuing indemnification obligations pursuant to Section 13 of this Agreement.

5.   <u>Discounted Liquidated Damages</u>.  We will reduce the amount of liquidated damages payable to us under this <u>Section 10(d)</u> by 20% (the "<u>Discounted Liquidated Damages Amount</u>") if, within 15 days of termination of this Agreement, you (i) discontinue all use of our Intellectual Property (including the Brand Mark and Choice-Related Words), (ii) pay all outstanding fees and charges due under this Agreement, and (iii) pay the Discounted Liquidated Damages Amount to us by certified or cashier's check.

e.   <u>Evidence of Breach.</u>  If the validity of the termination of this Agreement is disputed, either you or we may introduce evidence of a breach of this Agreement or evidence of any claim associated with the Hotel, including any facilities that are managed by others at the Hotel, whether or not stated in the default or termination notice.

**11.  <u>Obligations on Termination.</u>**  On termination or expiration of this Agreement for any reason, you must, at your expense:

a.   <u>Intellectual Property</u>.  Immediately discontinue all use of our Intellectual Property, refrain from using the Brand Mark to identify the Hotel and continue not to use the Choice-Related Words even after expiration or termination of this Agreement.  If you do not immediately discontinue use of our Intellectual Property (including the Brand Mark) or use the Choice-Related Words following the expiration or termination of this Agreement, you will pay us as liquidated damages and not as a penalty, the sum of $2,500 for each day following the termination of this Agreement that you continue to use our Intellectual Property (including the Brand Mark) or the Choice-Related Words, and we will seek injunctive and equitable relief for your infringement (or use of the Choice-Related Words) and, in that event, you waive, to the maximum extent permitted by law, any requirement for any bond for the issuance of any injunction,

12

and if a bond is required, you agree that it will not exceed $1,000;

b. <u>Registration</u>.   Cancel any assumed name or similar registration containing our Intellectual Property (including the Brand Mark) or any variation or portion of our Intellectual Property (including the Brand Mark) or the Choice-Related Words, and furnish us with reasonable evidence showing that you complied with this obligation within 30 days after termination or expiration of this Agreement;

c. <u>Payment</u>.   Promptly pay all sums owed to us and our subsidiaries or affiliates, and all damages, costs, and expenses, including reasonable attorneys' fees, that we incur, either before or following the termination of this Agreement, as a result of your default, including all outstanding Monthly Fees, any liquidated damages due under this Agreement, and any costs and expenses we incur to obtain injunctive relief for the enforcement of any portion of this Agreement; and

d. <u>Return Materials</u>.   Immediately send us all originals and copies of any materials that we have provided to you relating to our System and your operation of the Hotel, including all copies of any manuals, the Rules and Regulations and any data stored in or generated by our Property Management System and Reservation System.   Except for your copy of this Agreement and other documents that you reasonably need to comply with applicable laws, you may not retain any material that we provided to you during the Term.

## 12. <u>Insurance</u>.

a. <u>Coverage During Construction or Complete Renovation</u>.   You must purchase by the Construction Start and maintain until the Opening Date, at your expense, directly or through your general contractor, the following insurance coverages.

1. <u>General Liability</u>.   Commercial General Liability Insurance (including automobile liability, bodily injury and property damage) protecting you and naming us and our affiliates and subsidiaries, our and their respective officers, directors, agents and employees as Additional Insureds (as defined in <u>Section 12(c)</u>) from and against all types of liabilities, including personal injury and property damage, together with the costs of defense and/or adjustments arising out of the operations to construct or renovate the Hotel.   The coverages must provide limits of coverage not less than $1,000,000 per occurrence, must include coverages for contractual liability, explosion, collapse and underground property damage hazard liability, personal injury liability, products and completed operations liability, owner's and contractor's protective liability, and independent contractor's liability and must be accompanied by waivers of subrogation in our favor.

2. <u>Builder's Risk</u>.   All-risk builder's risk coverage to insure the Hotel buildings under construction or renovation to 100% of their replacement cost value, protecting you, us and the Additional Insureds, and a workers' compensation policy as required by statute.

b. <u>Coverage During The Term</u>.   Beginning no later than the Opening Date and for the rest of the Term, you must purchase and maintain, at your expense, the type and amounts of insurance coverage listed in this <u>Section 12(b)</u>.

1. <u>Physical Damage Coverage</u>.   All-risk physical damage coverage, insuring the Hotel and its contents for its full replacement cost.   If the Hotel is damaged or destroyed, and unless a mortgagee requires otherwise, the proceeds of any insurance will be used to repair or restore the Hotel in accordance with your plans that we approve.   Your insurance must contain a waiver of subrogation in our favor and the favor of our affiliates and subsidiaries, the officers, directors, agents and employees of us, our affiliates and subsidiaries.

2. <u>General Liability; Automobile</u>.   Commercial Automobile and Commercial General Liability Insurance policies written on an occurrence form protecting you and the Additional Insureds (as defined in <u>Section 12(c)</u>) from and against all manner of liability.   The coverage described in the preceding sentence is primary to any coverage that we maintain and must include Contractual, Products and Completed

KS187

Operations, Independent Contractors, Personal Injury, Property Damage, Bodily Injury and Host Liquor Liability coverage (if applicable), together with the costs and expenses of the defense and/or adjustment of injury or damage, without exception, from or in any way related to any operation or activity conducted under this Agreement and/or of the Hotel, including adjacent areas like swimming pools, parking lots, restaurants, and bars. Your Automobile Liability Policy must cover owned, hired and non-owned vehicles used in the operation of the Hotel. The policies described in this Section 12(b)(2) must apply to lawsuits or actions brought anywhere in the world. These policies must provide limits per location of not less than $5,000,000 ($10,000,000 if the Hotel has 6 or more stories) per occurrence and must be accompanied by a waiver of subrogation in favor of the Additional Insureds. You may meet the required total minimum limits through a combination of primary and umbrella policies. If alcoholic beverages are sold at the Hotel (whether or not you own the establishment that sells the alcohol), you must purchase and maintain Dram Shop/Liquor Liability Insurance with limits of not less than $5,000,000 per occurrence.

3. <u>Workers' Compensation</u>. Statutory Workers Compensation and Employers Liability insurance with minimum Employers Liability limits of $100,000 by accident and $100,000 by disease.

4. <u>Business Interruption</u>. Business interruption insurance which shall provide for coverage of a minimum of three (3) months in the event the Hotel is not operational at any time during the Term. Your business interruption insurance policy must name us as a specific loss payee.

c. <u>Additional Insured Requirement</u>. You must also obtain and attach an endorsement to the policies required in <u>Sections 12(a) and 12(b)</u> adding us, our affiliates and subsidiaries, our and their respective officers, directors, agents, partners and employees, as additional insureds ("<u>Additional Insureds</u>").

d. <u>Rating, Primary Coverage; Notice of Change</u>. You must place your insurance with insurance companies reasonably acceptable to us and with an A.M. Best Rating of A-, VI or better. All insurance that you purchase must be specifically endorsed to provide that the coverage will be primary and that any insurance carried by Additional Insureds will be excess and non-contributory. We may reasonably change the above insurance coverage requirements during the Term by giving you at least 30 days notice of the change. You must comply with our directions, at your expense, and deliver to us evidence of your compliance before the change becomes effective.

e. <u>Certificates of Insurance</u>. You must send us, at least 10 days before the Opening Date, certificates of insurance indicating your property code, the Hotel name and address, and proof that you have purchased the required insurance coverage and the Additional Insureds endorsement has been accepted by your insurance carrier. You must also provide us with evidence of renewal before the expiration date of each insurance policy. You or your insurer must provide us with 30 days advance written notice if the certificate of insurance by the insurer has been canceled, reduced in coverage, or otherwise altered (or 10 days advance written notice for non-payment of premiums).

f. <u>Procurement of Insurance</u>. If you, for any reason, fail to procure or provide us with evidence that you maintain at least the minimum insurance required by <u>Section 12(a) or 12(b)</u>, as applicable, (or as designated by us from time to time in the Rules and Regulations) together with the endorsement required by <u>Section 12(c)</u>, you acknowledge and agree that we will have the immediate right and authority, but not the obligation, to procure such insurance on your behalf, and charge the cost of the insurance to you. You agree that you will reimburse us for the cost of such insurance and for any reasonable out-of-pocket costs that we incur should we elect to obtain such insurance within 30 days of receipt of our notice that such costs are due and payable to us.

g. <u>No Waiver of Obligations</u>. Your purchase and maintenance of insurance and your performance of your obligations under this Agreement are in addition to your obligation to indemnify us. You may obtain additional insurance coverage since we do not require insurance against all potentially insurable risks; if you do, you will name us as an Additional Insured on this additional coverage provided there is no additional premium for this coverage.

**13. Indemnification**.   To the fullest extent permitted by law, you must defend, indemnify and hold harmless us, our affiliates and subsidiaries, our and their respective officers, directors, agents, partners and employees (each, an "Indemnified Party") from and against any claim, loss, cost, damage, expense judgment and liability, including environmental liability (a "Claim"), including reasonable attorneys' fees (whether or not a lawsuit has been filed) and any court costs, resulting in whole or in part from any damage or loss, including personal injury, of any nature, connected with the Hotel construction, renovation or operation, or any facilities that are managed by others in the Hotel, or out of, or as a result of, in whole or in part your (or your agent's or employee's) error, omission, act or failure, even where negligence of an Indemnified Party is alleged, except to the extent that the loss, costs, damage, expense or liability is solely and proximately caused by the negligence of an Indemnified Party. Notwithstanding the foregoing, if we are required by a court of law to contribute to any Claim, the amount of our contribution will be calculated by applying principles of comparative negligence where a Claim was jointly caused by your negligence and by our negligence. You must reimburse us for all amounts we reasonably spend, including attorneys' fees and court costs, to protect the Indemnified Parties from, or to remedy, your defaults under this Agreement or claims arising out of your operation of the Hotel. We will have the sole and exclusive control (including the right to be represented by attorneys of our choosing) over the defense of any Claims against an Indemnified Party and over their settlement, compromise or other disposition. This provision will be deemed divisible, such that if it is in any way (or to any extent) determined to be invalid or unenforceable, it will be deemed modified so as to be valid and enforceable and to be in full force and effect to the fullest extent permitted by law. This provision will survive the expiration or earlier termination of this Agreement.

**14. Casualty.**   If the Hotel is damaged by fire or other casualty, you must promptly and properly repair the damage. If the damage or repair requires closing the Hotel, you must immediately notify us, begin reconstruction within 6 months after that closing; reopen the Hotel for continuous business operation in accordance with the Rules and Regulations as soon as practicable (but in any event within 12 months after the Hotel closing), and send us at least 30 days' prior written notice of the date of reopening. We will extend the Term of this Agreement by the number of days between the date of the original closing of the Hotel and the date of reopening. If your insurance proceeds are not available to repair or rebuild the Hotel and if you provide us with reasonable evidence that such proceeds are not available to you within 6 months after the original closing of the Hotel, and provided that you were not in default at the time of casualty, then we will terminate this Agreement without penalty to either party.

**15. Notices.**   All notices required or permitted under this Agreement must be in writing, must be personally delivered or mailed by registered or certified mail, return receipt requested, or by a nationally recognized overnight delivery or courier service, to us at **Choice Hotels International, Inc., 10750 Columbia Pike, Silver Spring, Maryland 20901, Attention: General Counsel**, and to you at the Designated Representative's address that you have provided to us. You authorize the Designated Representative to submit written notices to us or receive our written notices to you as your agent. Any notice by registered or certified mail or by courier service is deemed given and received at the date and time of sending. You may change the Designated Representative and/or the Designated Representative's address by written notice to us, and we may change our address by written notice to you.

**16. Attorneys' Fees**.   Attorneys' fees must be paid according to the terms of this Section 16 and also, as may be applicable, Section 13 of this Agreement. The prevailing party (as determined by the court or arbitrator) in any arbitration or claim filed to enforce the terms of this Agreement will recover from the other party the reasonable expenses of its attorneys, whether that attorney is employed by you or us or specially retained in connection with the proceeding, along with any court costs, arbitration costs, arbitrator fees, the reasonable costs of necessary expert witnesses, and the reasonable travel costs (including food and lodging) of the prevailing party's witnesses in the proceeding. If such a claim seeks, in whole or in part, attorneys' fees under Section 13, that provision will control. Attorneys' fees, including those payable to any attorney who is an employee of yours or ours, will be determined by reference to the usual and customary rate for such attorney, and the rates charged by attorneys of similar background and experience performing similar work in the area where the proceeding is conducted. Any judgment or arbitration award for fees or other amounts owed to us to enforce our rights under Section 4, Section

15

10(d) or Section 21 of this Agreement will bear interest at the rate referred to in Section 4(f) until paid.

### 17. Taxes, Permits; Notice of Legal Actions.

a. <u>Taxes</u>. You must pay when due all taxes related to the Hotel that may be levied or assessed by any federal, state, or local taxing authority, and all other indebtedness related to the Hotel. You must pay any sales tax, gross receipts tax, or similar tax imposed on us (but not our income taxes) on any payments that you must make to us under this Agreement. If there is a bona fide dispute as to liability for taxes assessed or other indebtedness, you may contest the validity or the amount of the tax or indebtedness under the procedures of the taxing authority or applicable law. You may not permit a tax sale or seizure by levy of execution or similar writ or warrant, or attachment by a creditor to occur against the Hotel or the Location.

b. <u>Permits</u>. You must timely obtain all permits, certificates, or licenses necessary for the construction, renovation, operation and maintenance of the Hotel, including licenses to do business, fictitious name registration and sales tax permits, health and sanitation permits, and ratings and fire clearances. You must send us (or our designated representative), within 10 days of your receipt, copies of all inspection reports, warnings, certificates, and ratings, received from any governmental entity.

c. <u>Notice of Suit</u>. You must notify us in writing and provide us with copies, within 5 days of your receipt, of any action, suit, proceeding, or the issuance of any order, writ, injunction, award, or decree of any court, agency, or other governmental instrumentality affecting you or the Hotel.

### 18. Approvals and Waivers.

a. <u>Approvals</u>. Our approvals and consents will not be effective unless signed by one of our duly-authorized representatives. We may withhold our consent in our reasonable discretion or at any time when you are in breach of any obligation under this Agreement.

b. <u>Reliance; No Liability</u>. Except as otherwise expressly stated in this Agreement (including any addenda or amendments), we make no warranties or guarantees on which you may rely. We assume no liability or obligation to you by providing any waiver, approval, consent, suggestion to you, or by reason of any delay or denial of any request that you make to us.

c. <u>No Waiver/Forbearance</u>. Failure to exercise any power or to insist on strict compliance with any obligation or condition under this Agreement is not a waiver of any future right to demand exact compliance with any of the terms in this Agreement. Waiver of any particular default will not affect or impair a party's right with respect to any later default of the same, similar, or a different nature. No delay, forbearance, or omission to exercise any power or right of a party following any breach or default of any of the terms, sections, or covenants of this Agreement by the defaulting party, will affect or impair the rights of the party not in default.

### 19. Acknowledgments.

a. <u>No Warranty or Guarantee</u>. You acknowledge and agree that you have conducted an independent investigation of the benefits of signing this Agreement, and you understand that the business venture contemplated by this Agreement involves business risks, and that its success will be largely dependent on your ability as an independent business person. We have not made, and you acknowledge that you have not received from us or our agents, any representations, projection, warranty or guarantee, express or implied, as to the profitability or other potential success of the business venture contemplated by this Agreement, except as contained in the Franchise Disclosure Document.

b. <u>Limited Rights</u>. You acknowledge and agree that this Agreement and the limited rights to use the Intellectual Property granted to you under this Agreement relate only to the Hotel and the Location. Subject to the terms of our Impact Policy and Fair Franchising Policy: (i) we may own, operate, or franchise other hotels and/or allow such hotels to use our Intellectual Property (including the Brand Mark),

16

KS187

at any other location, either separately or combined, and (ii) we, and any of our affiliates and other franchisees may now or in the future engage in transient lodging or related business activities that may compete with the Hotel.

c.   Control; No Duty; Independent Contractor.   You acknowledge and agree that you are solely responsible for exercising ordinary business control over the Hotel, including personnel matters of Hotel employees and pricing of rooms and other services at the Hotel.   This Agreement does not create a fiduciary relationship between you and us.   You are an independent contractor.   Nothing in this Agreement makes, or is intended to make, either party an agent, legal representative, subsidiary, joint venturer, partner, employee, or servant of the other (except that you agree that we may act as your agent when making reservations for your Hotel).

d.   No Right to Contract; No Third Party Obligations; Truthfulness.   You acknowledge and agree that you are not authorized to make any contract, agreement, warranty, or representation on our behalf, or to incur any debt or other obligation in our name.   You acknowledge and agree that you will not represent in any proposed financing agreement or to any proposed lender or participant in a public or private investment offering that we or any of our affiliates is, or will, become responsible for your obligations under the financing agreement, nor that we are, or will be, participating in any private or public investment offering. Before you distribute a prospectus of your intended private or public offering, you must send us a copy for our prior written approval, not to be unreasonably withheld, of references made to us in the prospectus. You warrant the truth and completeness of all your statements in your application and the content of all other documents that you send to us as part of the application process and that you are required to submit to us under this Agreement.

e.   Disclosure.   You acknowledge that you received from us the Franchise Disclosure Document required by the Federal Trade Commission and by the applicable state(s) in which you live and where the Hotel is located at least 14 days before you signed this Agreement or paid to us any consideration for the hotel franchise other than the $2,500 application fee.

f.   Ownership; Data.   You warrant that you are the true owner of, and record holder of title to, the Hotel, unless you have told us in the application that you lease the Hotel under a lease with at least 10 years remaining in its term.   You acknowledge and agree that each of we and you own the rights in and to any data captured by the Property Management System or Reservation System and that we may use that data in any reasonable manner that we determine.

g.   Franchise Association.   You acknowledge and agree that we will consult with the Franchise Association on (i) the use of the System Fee for marketing campaigns that we will undertake for the Hotel and for all other hotels that are authorized to use the Brand Mark and/or our System, (ii) the use of the System Fee for the Property Management System and Reservation System, and (iii) changing the amount of the System Fee.   You acknowledge and agree that we will consult with the Franchise Association before making any material changes to the Impact Policy or Fair Franchising Policy, and that we will, if requested, provide annually to the Franchise Association audited financial statements as soon as reasonably practicable showing the receipts and expenditures relating to the System Fee.   However, you acknowledge and agree that we are not required to obtain the consent of the Franchise Association on any of these matters.

h.   System Fee.   You acknowledge and agree that we may use the System Fee to meet all costs incident to providing the Hotel (and all other hotels authorized to use our System) with marketing and advertising services, the Property Management System, and the Reservation System, and that such costs may include certain of our overhead expenses that are reasonably allocated to provide such services.   You further agree that, subject to Section 19(g), above, we have the absolute and unilateral right to determine, when, how and what portion of the System Fee may be used for (i) marketing purposes, including the right to purchase and pay for marketing services, product research and development, production materials, ad slicks, brochures, videotapes, radio and television commercials, media advertising (internet, e-commerce, television, radio, cable, magazines, newspapers and other print), services provided by advertising agencies, market research, trade shows, promotions, research

17

KS187

and design, public relations, and frequency programs, (ii) the development, operation and maintenance of the Property Management System and Reservation System, and (iii) the cost of personnel, accounting services, travel expenses, office space, overhead costs, administrative costs, computers, other equipment, furniture, salaries and fringe benefits, development, design and maintenance of internet web-pages and websites, including internet service provider costs, network costs, and for other similar costs that we reasonably deem to be appropriate. You also acknowledge that other franchisees authorized to use our System may not contribute the same percentage or total amount that you must pay to us as the System Fee.

    i.   <u>Online Terms of Use</u>.  You acknowledge and agree that your right to use the Property Management System and the Reservation System will be governed by the Online Terms of Use that are provided to you in an online format which you agree to review periodically. You acknowledge and agree that the Online Terms of Use are a part of this Agreement and you will comply with the terms and conditions of the then-current Online Terms of Use. You agree that you, the Hotel's general manager, or any other authorized employee of the Hotel ("<u>Authorized User</u>") may accept and agree on behalf of you to the terms and conditions of the Online Terms of Use. You also acknowledge and agree that we have the right, in our sole discretion, to modify, add or remove any terms or conditions of the Online Terms of Use. Changes to the Online Terms of Use will be posted online and will be immediately effective. You agree that use by an Authorized User of the Property Management System or the Reservation System, as applicable, after we post any such changes, will indicate that you accept and agree to the Online Terms of Use, as modified.

    j.   <u>No Liability</u>.  You acknowledge and agree that neither party assumes liability for, or will be deemed liable as a result of, any action or omission of the other party or any claim or judgment arising from any such action or omission.

**20. <u>Miscellaneous</u>.**

    a.   <u>Severability</u>.  If any section of this Agreement is held to be illegal, invalid or unenforceable, both parties agree that (i) the section will be removed; (ii) this Agreement will be understood and enforced as if the illegal, invalid, or unenforceable section had never been in this Agreement; and (iii) the remaining sections will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable section or by its removal.  A section similar to the removed section will be automatically added as a part of this Agreement to the maximum extent enforceable.

    b.   <u>No Third Party Beneficiaries</u>.  Except as otherwise expressly provided in this Agreement, nothing in this Agreement is intended, nor will anything in this Agreement be deemed, to confer on any person or legal entity other than us or you, or our respective successors and permitted assigns, any rights or remedies under or by reason of this Agreement.

    c.   <u>Headings</u>.  All captions and headings in this Agreement are intended solely for the convenience of the parties and do not affect the meaning or construction of any section.

    d.   <u>References</u>.  All references to the masculine, neuter, or singular, include the masculine, feminine, neuter, or plural.  The word "include" and its derivatives are not to be construed as terms of limitation.  If "you" consists of more than one person or entity, your acknowledgments, promises, covenants, agreements, and obligations made or undertaken in this Agreement are jointly and severally undertaken by each of you.

    e.   <u>Counterparts</u>.  If this Agreement is executed in multiple counterparts, each executed copy is an original.

    f.   <u>Governing Law</u>.  This Agreement becomes valid and effective only when we have signed it, and it will be interpreted under the substantive laws of Maryland, not including its conflict of laws provision or such provisions of any other jurisdiction; except that nothing herein shall be construed to establish independently your right to pursue claims under Maryland's Franchisee Registration and Disclosure Law.

KS187

g.   Cumulative Rights and Remedies.   Rights and remedies stated in this Agreement are cumulative and not exclusive of any other right or remedy.

h.   Addenda/Amendments.   Any addenda or amendments to this Agreement will not be effective unless signed by one of our duly-authorized representatives and by you.  All duly-executed addenda and/or amendments are incorporated into and will become a part of this Agreement.

i.   Survival.   Those of your obligations and our obligations under this Agreement which expressly or by their nature survive the expiration or earlier termination of this Agreement will survive such expiration or termination, including Sections 7, 10(d), 11, 13, 16, 17, 18, 19, 20, 21 and 22.

**21.  Arbitration.  Except for our claims against you for indemnification or actions seeking to enjoin you from using any of the our Intellectual Property (including the Brand Mark) or the Choice-Related Words in violation of this Agreement, any controversy or claim arising out of or relating to this Agreement, or the breach of this Agreement, including any claim that this Agreement or any part of this Agreement is invalid, illegal, or otherwise voidable or void, as well as any claim that we violated any laws in connection with the execution or enforcement of this Agreement and any claim for declaratory relief, will be sent to final and binding arbitration before either the American Arbitration Association, J.A.M.S., or National Arbitration Forum in accordance with the Commercial Arbitration Rules of the American Arbitration Association, including its rules for emergency measures of protection, except to the extent that the Commercial Rules of the American Arbitration Association may be interpreted to require you or us to produce documents, witnesses, or information at a time other than at a hearing on the claim without our mutual consent.  In the event more than one demand for arbitration is filed in connection with this Agreement, the demand filed with the American Arbitration Association, J.A.M.S., or National Arbitration Forum office having jurisdiction over Maryland proceedings shall take precedence, and any other demand shall be withdrawn and presented in the Maryland filing.  The arbitrator will apply the substantive laws of Maryland, without reference to its conflict of laws provision, except that nothing herein shall be construed to establish independently your right to pursue claims under Maryland's Franchise Registration and Disclosure Law. Judgment on the arbitration award may be entered in any court having jurisdiction.  If any party fails to appear at any properly noticed arbitration proceeding, an award may be entered against the party, notwithstanding its failure to appear.  Any arbitration will be conducted at our headquarters office in Maryland. Nothing in this Section 21 will be construed as requiring you or us to make a claim in arbitration before exercising any rights you or we may have to give notice of default or termination in accordance with the terms of this Agreement.**

**22.   INTEGRATION.   THIS AGREEMENT CONTAINS THE COMPLETE UNDERSTANDING OF THE PARTIES AND REPLACES ANY PREVIOUS WRITTEN OR ORAL AGREEMENT ON THE SAME SUBJECT MATTER.   NO REPRESENTATION, INDUCEMENT, PROMISE OR AGREEMENT, ORAL OR OTHERWISE, NOT CONTAINED IN THIS AGREEMENT OR IN OUR FRANCHISE DISCLOSURE DOCUMENT, WILL BE OF ANY FORCE OR EFFECT.**

KS187

We and you (and your principals, if a limited liability company, partnership or corporation) agree to be bound by the terms and conditions of this Agreement by setting the hands and seals of our duly authorized and empowered representatives on this Agreement, effective on the first date written above.

Witness:

_____

Name:  Nick Lewis
Title:  Senior Counsel

**Choice Hotels International, Inc.,**
a Delaware corporation

By:_____ L.S.
Name:  Ron Parisotto
Title:  Senior Vice-President

**RAM INVESTMENT INC.,** a Kansas Corporation,
**Nitin Bhakta,** Individually, jointly and severally

**Witness:**

X_____

Print Name of Witness:

Bhavna Bhakta

**RAM INVESTMENT INC.,** a Kansas Corporation

X By:_____ L.S.
Name: **Nitin Bhakta**
Title: President

Date: X  6-28-2011

**Witness:**

X_____

Print Name of Witness:

Bhavna Bhakta

**Nitin Bhakta,** Individually

X_____ L.S.

Date: X 6-28-2011

**Witness:**

X_____

Print Name of Witness:

X By:_____ L.S.
Name:
Title:

Date: X_____

## PLEASE COMPLETE ATTACHED SCHEDULE A

KS187

## Schedule A – Entity Ownership Breakdown

By signing the Franchise Agreement to which this Schedule A is attached, you certify that the information you provide below is true and accurate. The following represents the names, social security numbers and percentages owned of **RAM INVESTMENT INC**

| *Name of member/shareholder/partner* | *Percentage owned* | *Social Security Number* |
|---|---|---|
| X Nitin · BHAKTA (type or print) | X 100 % | X |
| (type or print) | _____ % | |
| (type or print) | _____ % | |
| (type or print) | _____ % | |
| (type or print) | _____ % | |
| (type or print) | _____ % | |
| (type or print) | _____ % | |
| (type or print) | _____ % | |
| (type or print) | _____ % | |
| (type or print) | _____ % | |

21

VAULT

KS187 - 23433
**Comfort Inn & Suites**

## ADDENDUM NO. 1

The Franchise Agreement ("Agreement") of even date between Choice Hotels International, Inc., a Delaware corporation ("we" or "us") and **RAM INVESTMENT INC**., a Kansas Corporation, **Nitin Bhakta**, Individually, jointly and severally  ("you") is amended by the following:

1.     <u>Sleep Impact Waiver</u>.  You hereby waive all of your rights under the Impact Policy with respect to any application for any hotel that is applying to use the Sleep Inn Choice Mark. Furthermore, you agree not to oppose, challenge or otherwise file any legal action in connection with our granting of any hotel franchise using the Sleep Inn Choice Mark.

2.     <u>Requirements for Comfort Inn & Suites Hotels</u>. You may use an "& Suites" designation in connection with the Hotel, if approved in advance by us and provided that each of the following conditions are met:

a)     You submit plans and specification to us and receive all necessary approvals prior to commencing renovations or upgrades

b)     You agree to construct (or renovate) the Hotel and operate the Hotel in compliance with all of the requirements of the Comfort Inn & Suites brand.

c)     The Hotel must have interior corridors.

d)     Each suite must be at least 12' x 32' in size if it is equipped with 2 queen sized beds; and at least 12' x 29' in size if equipped with one king sized bed.

e)     Not less than 25% but not more than 50% of the total inventory of Sleeping Rooms must be suites.  "Shotgun" style suites are acceptable if there is a partial dividing wall and the minimum sizes listed in (d), above, are met.

f)     The living room section of each suite must be equipped with a full sized sleeper sofa.

g)     A microwave oven must be provided in each suite.  The microwave must have at least 0.75 cubic ft. capacity, provide not less than 600 watts of cooking power, and be UL (Underwriters Laboratory) approved.

h)     Each suite must contain a UL approved refrigerator of not less than 2.8 cubic ft.

We reserve the right to withdraw the "& Suites" designation in the event of your failure to comply with Comfort Inn & Suites Rules and Regulations at any time during the Term if such failures are not cured within the cure periods applicable to such failure.

3. <u>Confidentiality</u>. You agree to keep the grant of the modification(s) contained in this Addendum in strict confidence and will not disclose them to any persons other than your directors, officers, partners, employees, agents and advisors who have a need to know for the purpose of operating the Hotel.  Any unauthorized disclosure is a default under the Agreement, and we may, at our option, immediately terminate the Agreement on notice to you or may revoke the modification(s) contained in this Addendum upon any unauthorized disclosure by you.  The modification(s) outlined in this Addendum are for the Hotel only and do not indicate that other hotels owned by you or by others will receive similar modification(s).

4.     <u>Defined Terms; Integration</u>. Capitalized terms that are used in this Addendum but not defined in this Addendum will have the meaning given to these terms in the Agreement.  This Addendum is incorporated into and will become a part of the Agreement when duly signed.

Addendum No. 1 (KS187 - 23433)
June 20, 2011

Addendum No. 1
Page 2

5.   Order of Precedence.  In the event of any conflict or inconsistency between the terms of the Agreement and the terms of this Addendum, the terms of this Addendum will supersede and control.  In all other respects, the terms of the Agreement are ratified and confirmed.

The parties to this Addendum agree to be bound by the terms of this Addendum as of the effective date of the Agreement as evidenced by their signatures below.

Witness:

Name: Nick Lewis
Title: Senior Counsel

**Choice Hotels International, Inc.,**
a Delaware corporation

By:_____ L.S.
Name: Ron Parisotto
Title: Senior Vice-President

**RAM INVESTMENT INC.,** a Kansas Corporation,
**Nitin Bhakta,** Individually, jointly and severally

**Witness:**

X _____
Print Name of Witness:
Bhavna  Bhakta

**RAM INVESTMENT INC.,** a Kansas Corporation

XBy:_____ L.S.
Name: **Nitin Bhakta**
Title: President

Date: X 6 - 28 - 2011

**Witness:**

X _____
Print Name of Witness:
Bhavna  Bhakta

**Nitin Bhakta,** Individually

X _____ L.S.

Date: X 6 - 28 - 2011

**Witness:**

X _____
Print Name of Witness:

X By:_____ L.S.
Name:
Title:

Date: X _____

Addendum No. 1 (KS187 - 23433)
June 20, 2011

KS187 - 0000023433
Comfort Inn & Suites, Junction City

## ADDENDUM NO. 2

THIS ADDENDUM (this "Addendum") is between **Choice Hotels International, Inc.** ("Choice, Franchisor or We"), a Delaware corporation and **RAM INVESTMENT INC.**, a Kansas Corporation, **Nitin Bhakta**, individually, jointly and severally ("Franchisee, You or Your") is effective as of the date last written below.

## BACKGROUND:

A.     Choice and You entered into a Franchise Agreement dated June 30, 2011 (the "Agreement"), whereby Choice granted and You accepted a license to operate a **Comfort Inn & Suites** hotel business at **221 East Ash Street, Junction City, KS 66441** (the "Hotel").

B.     The parties mutually desire to amend the Agreement on the terms provided in this Addendum.

NOW THEREFORE, in consideration of the promises and for other good and valuable consideration, the parties agree as follows:

### *After Entering the System ("AES")*

1.     Pursuant to the attached Exhibit A, you agree to complete the list of improvements and/or repairs after entering the **Comfort Inn & Suites** System (the "AES Deadline") to upgrade the Hotel to meet the requirements of the Rules and Regulations and to satisfy the requirements of our Quality Assurance Review process.

2.     You agree to complete the required list of improvements and/or repairs (each an "AES Item") to upgrade the Hotel by the corresponding AES Deadline specified above. If you fail to complete an AES Item by its AES Deadline (each such failure, an "AES Failure"), it will be considered a default of your obligations that could result in our termination of the Agreement as outlined in Section 10. You acknowledge that an AES Failure will often require us to re-inspect the Hotel, and that you will be charged a reasonable fee (which will not exceed $3,000) for each such re-inspection that we conduct.

### *Confidentiality –*

3.     You agree to keep the grant of the modification(s) contained in this Addendum in strict confidence and will not disclose them to any persons other than your directors, officers, partners, employees, agents and advisors who have a need to know for the purpose of operating the Hotel. Any unauthorized disclosure is a default under the Agreement, and we may, at our option, immediately terminate the Agreement on notice to you or may revoke the modification(s) contained in this Addendum upon any unauthorized disclosure by you. The modification(s) outlined in this Addendum are for the Hotel only and do not indicate that other hotels owned by you or by others will receive similar modification(s).

### *Defined Terms; Integration -*

4.     Certain capitalized terms may not be defined in this Addendum or the Agreement and such terms are being used in the normal course of dealing and as commonly used in the

Postexecu2011/KS187add2
9/9/11

hospitality industry in order to assist you to better understand your obligations under this Addendum. This Addendum is incorporated into and will become a part of the Agreement when duly signed.

*Order of Precedence -*

5.      In the event of any conflict or inconsistency between the terms of the Agreement and the terms of this Addendum, the terms of this Addendum will supersede and control. In all other respects, the terms of the Agreement are ratified and confirmed.

        The parties to this Addendum agree to be bound by the terms of this Addendum as of the effective date of the Agreement as evidenced by their signatures below.

        IN WITNESS WHEREOF, the parties have set their hands and seals on _____ /  , 2011.

Witness:

Name: Denise Wills
Title: Lead Specialist

**Choice Hotels International, Inc.,**
a Delaware corporation

Name: _____
Title: Assistant General Counsel and
Assistant Secretary

**RAM INVESTMENT INC.,** a Kansas Corporation,
**Nitin Bhakta,** Individually, jointly and severally

Witness:

X _____
Print Name of Witness:

**RAM INVESTMENT INC.,** a Kansas Corporation

XBy: _____ L.S.
Name: **Nitin Bhakta**
Title: President

Date: X    11 – 28 – 11

Witness:

X _____
Print Name of Witness:

**Nitin Bhakta,** Individually

X _____ L.S.

Date: X    11 – 28 – 11

Postexecu2011/KS187add2
9/9/11



# CHOICE HOTELS
INTERNATIONAL®

## EXHIBIT A

| Property Code | KS187 | Scheduled Opening Date | 12/15/2011 |
|---|---|---|---|
| Brand | Comfort Inn & Suites | City | Junction City |

| Item | Description | Approved Due Date | Approved by Portfolio | Franchisee Initials |
|---|---|---|---|---|
| 1. | General Manager to complete certification training via HOST, CHA/CLM or other approved program. | AES 90 days | xSH | N. P. |
| 2. | Install additional exterior signage including a double face monument at the street entrance and a pole sign visible from Route 70. | 12/31/2011 | xSH | N. P. |
| 3. | Remove all construction trailers, equipment, roll offs and storage units from the site. | AES 30 days | xSH | N. P. |
| 4. | Provide sod in front of the building and hyrdo-seed surrounding grounds | 1/31/2012 | xSH | N. P. |

| | | | | |
|---|---|---|---|---|
| 5. | Install final landscaping including feature beds, seasonal flowers and potted plants and entrance. | AES 4 months | xSH | N. R. |
| 6. | Complete final parking lot paving and striping | AES 90 days | xSH | N. R. |
| 7. | Power wash all driving and parking areas to remove construction dirt | AES 90 days | xSH | N. R. |
| 8. | Wash all window exteriors | AES 90 days | xSH | N. R. |
| 9. | Install height sign on porte cochere | AES 90 days | xSH | N. R. |
| 10. | Provide wall treatment in lobby approved by CHI. | AES 90 days | xSH | N. R. |
| 11. | Provide wall treatment in exercise room approved by CHI. | AES 90 days | xSH | N. R. |

Dec.13.2011  03:29      Comfort Inn & Suites       78   579 5790           PAGE.  1/  1

Page 3 of 3

| 12. | Provide new top of bedding program that meets brand standards. Specifically, top of bedding program includes: Choice tagged pillows. Appropriate bed covering, blanket, sheets, bed skirt, mattress pad or pillow top pad. Consult Rules & Regulations for specification of each item | AES 3312012 | xSH | NKB |

KS187 - 0000023433
Comfort Inn & Suites, Junction City

## ADDENDUM NO. 3

**THIS ADDENDUM** (this "Addendum") between **Choice Hotels International, Inc.** ("Choice, Franchisor or We"), a Delaware corporation and **RAM INVESTMENT INC., a Kansas Corporation, Nitin Bhakta, Individually, jointly and severally** ("Franchisee, you or your") is effective as of the date last written below.

## BACKGROUND:

A.     Choice and You entered into a Franchise Agreement dated June 30, 2011 (the "Agreement"), whereby Choice granted and You accepted a license to operate a **Comfort Inn & Suites** hotel business at **221 East Ash Street, Junction City, KS 66441** (the "Hotel").

B.     The parties mutually desire to amend the Agreement on the terms provided in this Addendum.

NOW THEREFORE, in consideration of the promises and for other good and valuable consideration, the parties agree as follows:

### After Entering the System ("AES") –extension

1.     The *"Due Date"* for item (12) in Exhibit A of Addendum No. 2 is hereby changed to **No later than October 31, 2012 ("AES Deadline")** for the following item noted below:

12.     Provide new top of bedding program that meets brand standards. Specifically, top of bedding program includes: Choice tagged pillows. Appropriate bed covering, blanket, sheets, bed skirt, mattress pad or pillow top pad. Consult Rules and Regulations for specification of each item

2.     You agree to complete the required list of improvements and/or repairs (each an "<u>AES Item</u>") to upgrade the Hotel by the corresponding <u>AES Deadline</u> specified above. If you fail to complete an AES Item by its AES Deadline (each such failure, an "AES Failure"), it will be considered a default of your obligations that could result in our termination of the Agreement as outlined in <u>Section 10.</u>  You acknowledge that an AES Failure will often require us to re-inspect the Hotel, and that you will be charged a reasonable fee (which will not exceed $3,000) for each such re-inspection that we conduct.

### Confidentiality –

3.     You agree to keep the grant of the modification(s) contained in this Addendum in strict confidence and will not disclose them to any persons other than your directors, officers, partners, employees, agents and advisors who have a need to know for the purpose of operating the Hotel. Any unauthorized disclosure is a default under the Agreement, and we may, at our option, immediately terminate the Agreement on notice to you or may revoke the modification(s) contained in this Addendum upon any unauthorized disclosure by you.  The modification(s) outlined in this

Addendum are for the Hotel only and do not indicate that other hotels owned by you or by others will receive similar modification(s).

*Defined Terms; Integration -*

4.     Certain capitalized terms may not be defined in this Addendum or the Agreement and such terms are being used in the normal course of dealing and as commonly used in the hospitality industry in order to assist you to better understand your obligations under this Addendum. This Addendum is incorporated into and will become a part of the Agreement when duly signed.

*Order of Precedence -*

5.     In the event of any conflict or inconsistency between the terms of the Agreement and the terms of this Addendum, the terms of this Addendum will supersede and control. In all other respects, the terms of the Agreement are ratified and confirmed.

6.     The parties to this Addendum agree to be bound by the terms of this Addendum as of the effective date of the Agreement as evidenced by their signatures below.

IN WITNESS WHEREOF, the parties have set their hands and seals on _____, 2012.

Witness:

Name: Denise Wills
Title: Lead Specialist

Choice Hotels International, Inc.,
a Delaware corporation

By: _____
Name:  Bret L. Limage
Title:  Assistant General Counsel and Assistant Secretary

**RAM INVESTMENT INC., a Kansas Corporation, Nitin Bhakta, Individually, jointly and severally**

**Witness:**

X _____
Print Name of Witness:

**RAM INVESTMENT INC., a Kansas Corporation**

XBy: _____ L.S.
Name: Nitin Bhakta
Title: President

Date: X  06 / 11 / 12

Postexecu2012\KS187add3
6/4/12

Page 2 of 3

**Witness:**

X _____

Print Name of Witness:

X _____ L.S.

**Nitin Bhakta, Individually**

Date: X _____



VAULT

KS187 - 23433
Comfort Inn & Suites

## GUARANTY

This Guaranty ("Guaranty") is made as of the **30** day of ___June___, 2011 by **Nitin Bhakta**, Individually ("Guarantor"), in favor of and for the benefit of Choice Hotels International, Inc., a Delaware corporation ("Choice"). In consideration of and as an inducement to Choice to execute a Franchise Agreement by and between Choice and **RAM INVESTMENT INC.**, a Kansas Corporation, **Nitin Bhakta**, Individually, jointly and severally ("Franchisee"), Guarantor agrees as follows:

1.      Guarantor unconditionally warrants to Choice and its successor and assigns that all of Franchisee's representations and warranties in (a) any application submitted by Franchisee to Choice; and (b) the Franchise Agreement are true, accurate and complete as of the time made as of the date of this Guaranty.

2.      Guarantor personally and unconditionally guarantees that all of Franchisee's obligations under the Franchise Agreement, as amended and any agreements relating to the use of our Property Management System or Reservation System ("Technology Agreement") will be punctually paid and performed.

3.      Guarantor agrees that the obligations of Guarantors under this Guaranty shall not be reduced, limited, terminated, discharged, impaired or otherwise affected by: (a) the occurrence or continuance of a default under the Franchise Agreement or the Technology Agreement; (b) any assignment of the Franchise Agreement; (c) any modification or amendment of, or waiver or consent or other action taken with respect to the Franchise Agreement, the Technology Agreement, or any related agreement; (d) the voluntary or involuntary liquidation, sale or other disposition of Franchisee's assets, or the receivership, insolvency, bankruptcy, reorganization or similar proceedings affecting Franchisee or its assets or the release or discharge of Franchisee from any of its obligations under the Franchise Agreement; or (e) any change of circumstances, whether or not foreseeable, and whether or not any such change does or might vary the risk of Guarantor hereunder. Any failure by Choice to exercise any power or right or to insist upon Guarantor's compliance with any term under this Guaranty shall not constitute a waiver of Choice's right to demand full compliance with any term of this Guaranty.

4.      Guarantor unconditionally and irrevocably waives notice of acceptance of this Guaranty, presentment, demand, diligence, protest and notice of dishonor or of any other kind to which Guarantors otherwise might be entitled under applicable law.

5.      Guarantor agrees to promptly pay all sums owed to Choice and its subsidiaries or affiliates, and all damages, costs, and expenses, including reasonable attorneys' fees, that Choice or its subsidiaries or affiliates incur as a result of any default under this Guaranty, the Franchise Agreement, or the Technology Agreement, including all outstanding fees, any liquidated damages due under the Franchise Agreement, and any costs and expenses that Choice or its subsidiaries or affiliates incur to obtain injunctive relief for the enforcement of any portion of this Guaranty, the Franchise Agreement, or the Technology Agreement.

6.      If more than one person or entity has signed this Guaranty as a Guarantor, the liability of each such Guarantor shall be joint, several and primary.

7.     All notices required or permitted under this Guaranty must be in writing, must be personally delivered or mailed by registered or certified mail, return receipt requested, or by a nationally recognized courier service, to Choice at **Choice Hotels International, Inc., 10750 Columbia Pike, Silver Spring, Maryland 20901, Attention: General Counsel**, and to Guarantor at the address set forth below.  Any notice by registered or certified mail or by courier service is deemed given and received at the date and time of sending.  Guarantor may change its address only by written notice to Choice, and Choice may change our address by written notice to Guarantor.

8.     This Guaranty will be interpreted under the substantive laws of Maryland, not including its conflict of laws provision or such provisions of any other jurisdiction.

9.     Except for our claims for indemnification or actions seeking to enjoin you the use of any of our Intellectual Property or the Choice-Related Words in violation of the Franchise Agreement, any controversy or claim founded upon or arising out of or relating to this Guaranty, the Franchise Agreement, or the Technology Agreement, or to the breach of this Guaranty, the the Franchise Agreement, or the Technology Agreement, will be sent to final and binding arbitration before either the American Arbitration Association, J.A.M.S., or National Arbitration Forum in accordance with the Commercial Arbitration Rules of the American Arbitration Association, including its rules for emergency measures of protection, except to the extent that the Commercial Rules of the American Arbitration Association may be interpreted to require you or us to produce documents, witnesses, or information at a time other than at a hearing on the claim without our mutual consent.  In the event more than one demand for arbitration is filed in connection with this Guaranty, the Franchise Agreement, or the Technology Agreement, the demand filed with the American Arbitration Association, J.A.M.S., or National Arbitration Forum office having jurisdiction over Maryland proceedings shall take precedence, and any other demand shall be withdrawn and presented in the Maryland filing.  The arbitrator will apply the substantive laws of Maryland, without reference to its conflict of laws provision, except that nothing herein shall be construed to establish independently a right to pursue claims under Maryland's Franchise Registration and Disclosure Law. Judgment on the arbitration award may be entered in any court having jurisdiction.  If any party fails to appear at any properly noticed arbitration proceeding, an award may be entered against the party, notwithstanding its failure to appear.  Any arbitration will be conducted at Choice's headquarters office in Maryland.  Nothing in this Section will be construed as requiring you or us to make a claim in arbitration before exercising any rights Choice or Guarantor may have to give notice of default or termination in accordance with the terms of this Guaranty.

IN WITNESS WHEREOF, the undersigned have set his/her/its/their hands and seals on the date noted above.

**Witness:**                                            **Nitin Bhakta**, Individually

X _____        X _____ L.S.
Print Name of Witness:                                       Social Security No. **X** _____

                                                             Date: **X**  6 -28 -2011

                                                             Address: **X** 1523 - mistletoc ciR.

                                                             **X** Junction city KS 66441

Choice Hotels International